UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES BEALE,

       Plaintiff,

v.                              Case No.: 8:20-cv-2210-VMC-CPT

CLEARWATER COMPLIANCE LLC,

       Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Clearwater Compliance LLC's Motion for Summary Judgment (Doc. # 40), filed on August 30, 2021. Plaintiff Charles Beale responded on September 27, 2021. (Doc. # 55). Clearwater replied on October 20, 2021. (Doc. # 58). For the reasons that follow, the Motion is granted.

**I.   Background**

Charles Beale was diagnosed with dyslexia at a young age by the Broward County School Board. (Doc. # 52 at 5). Because of his dyslexia, it takes Beale "longer to read and assimilate information" than an individual without dyslexia might. (Pl. Dep. Doc. # 44-1 at 136:23-24). Beale's dyslexia also causes letters and other characters to appear to him as reversed, which in turn creates difficulty in maintaining his reading

1

pace. (Id. at 153:19-23). Before working for Clearwater, Beale worked in the healthcare sales industry for fourteen years, where he earned several awards and recognitions for sales positions at other companies. (Doc. # 46-1 at 1-5). The resume he provided Clearwater showed that Beale had experience with maintaining sales quotas and generating new business for prior employers. (Id.; Pl. Dep. Doc. # 44-1 at 114:13-14).

Beale began working for Clearwater[1] on February 11, 2019 as a Senior Sales Director for Regional Accounts. (Doc. # 44-1 at 101:19-21; Doc. # 54 at ¶ 2). He was one of several individuals hired by Clearwater for a Senior Sales Director position between February and May 2019. (Doc. # 42-1 at ¶ 9). Beale was specifically hired to manage the Gulf Coast Territory, encompassing Florida, Alabama, Mississippi, and Louisiana. (Doc. # 54 at ¶ 2).

Before starting with Clearwater's sales team, Beale interviewed several times with three Clearwater representatives: Dan Pruyn, a Senior Vice President and Chief Sales Officer; Barry Mathis, a Senior Vice President and Chief

---

[1] Clearwater provides enterprise cyber risk management and HIPAA compliance solutions to the healthcare industry. (Doc. # 41-1 at ¶ 3).

Business Development Officer; and Steve Cagle, Chief Executive Officer. (Pl. Dep. Doc. # 44-1 at 104:3-5; 104:19-22; 116:5-9). Throughout his interviews, Beale shared that he had been diagnosed with dyslexia. (Id. at 105:15-18; 110:10-13; 118:25-119:2). He informed these Clearwater representatives that, even with his dyslexia, he went on to attain higher education and other sales positions throughout his life. (Id. at 105:15-24; 105:15-18; 110:10-13; 118:25-119:2;). Beale went as far as to indicate that he "overcame" his dyslexia with the assistance of special computer fonts and frequent reading. (Id. at 105:8-24; 106: 4-6; 106:13-24; 110:10-111:2). Clearwater ultimately hired Beale, who began his employment on February 11, 2019. (Doc. # 54 at ¶¶ 2, 4).

All Senior Sales Directors were required to meet one hundred percent of the sales quota that Clearwater assigned them. (Doc. # 43-1 at 2). With his offer of employment, Beale received a copy Clearwater's Business Development Commission Plan that specifically advised that sales employees were expected to attain one hundred percent of their quota. (Doc. # 41-1 at ¶ 9; Doc. # 43-1 at 2; Doc. # 40 at ¶ 17; Doc. # 55 at ¶ 17). The Plan also included a notice that failing to meet one's assigned quota on a "frequent or consistent bases "could result in the employee's termination. (Doc. # 43-1 at

3

2). As a Senior Sales Director, Beale was expected to "consistently meet or exceed sales goals while ensuring high customer satisfaction throughout the sales." (Doc. # 44-1 at ¶ 8; Doc. # 46-1 at 6-10). Beale was also tasked with building and maintaining a sales pipeline to achieve his assigned quota, just as he did in prior sales positions. (Doc. # 46-1 at 6-10). All Senior Sales Directors were also expected to obtain new accounts for their assigned territories to achieve their sales quotas. (Id.; Doc. # 59 at ¶ 4).

At some time during his employment with Clearwater, Beale added the phrase "Dyslexia Awareness" to his email signature block. (Pl. Dep. II Doc. # 45-1 at 7:8:21). Only one email submitted into the record, dated April 24, 2019, reflects the "Dyslexia Awareness" signature block; the email appears to have been directed to an individual unaffiliated with Clearwater regarding Beale's registration for a summit. (Doc. # 53-4). Beale asserts that Clearwater human resources representative Elaine Axum verbally told him remove this phrase from his signature block after seeing the email. (Id. at 11:14-16). Ms. Axum denies seeing the email and instructing Beale to remove the phrase from his signature block. (Axum Dep. Doc. # 49-1 at 11:19-12:8).

Following his first quarter of employment, the parties dispute whether Beale's performance record was satisfactory in light of the one hundred percent sales quota he was assigned. (Doc. # 41-1 at ¶¶ 13-14; Doc. # 54 at ¶¶ 6-13). Beale recounts that his supervisor and Clearwater's CEO consistently told him that he was performing adequately since starting with Clearwater. (Doc. # 54 at ¶¶ 6-13). Beale did not recall ever being counseled, placed on a performance improvement plan, or being advised that he might be facing termination. (Pl. Dep. II Doc. # 45-1 at 37:15-38:3). Beale, along with the entire Clearwater sales team, were even recognized in a company periodical for their respective accomplishments. (Doc. # 52 at 32-33). Beale also insists that Clearwater had promised to transfer certain high-volume accounts over to him within his first ninety days of employment, which would have significantly aided his sales quota and pipeline metrics if Clearwater had followed through. (Doc. # 54 at ¶¶ 4-6).

In contrast, Clearwater maintains that Beale was terminated for "fail[ing] to achieve his requisite quota, his deficiencies in building his sales pipeline and the low scores received on the 10-P[oin]t Certification, Industry Trend Story Board Presentation and QBR evaluation." (Doc. # 41-1 at

5

¶ 26). Clearwater noted that Beale consistently failed to meet the one hundred percent quota required of all Clearwater sales employees as outlined in the Business Development Commission Plan. (Id. at ¶ 13; Doc. # 43-1 at 2; Doc. # 43-2 at 2). Yet, in his second quarter (and first full quarter upon commencement of his employment), Beale only satisfied fifty-seven percent of his sales quota established by Clearwater. (Doc. # 43-2 at 3). The following quarter, Beale achieved only twenty-five percent of his sales quota. (Id.). Mr. Pruyn also observed that Beale had the lowest "pipeline health percentage" of all sales representatives. (Doc. # 41-1 at ¶ 24; Doc. # 43-2 at 2-3).

Clearwater also conducted several assessments that confirmed Beale's performance in his Senior Sales Director position. For instance, Beale scored below-passing marks on a 10-Point Certification Sales Assessment — a "tool used to discover customers' business needs." (Id. at ¶ 14; Doc. # 46-1 at 67). Beale failed to obtain a passing score on any of the five competency areas tested by this assessment. (Doc. # 46-1 at 67). Mr. Pruyn again observed that Beale "was one of the lowest scoring Sales Representatives" on an Industry Trend Story Board Presentation. (Id. at ¶ 16; Doc. # 43-3 at 2-5). This presentation was designed to evaluate a sales

representative's knowledge of Clearwater's market subject matter, as well as their ability to present Clearwater's solutions and services. (Doc. # 41-1 at ¶ 16.). The Story Board assessment results show Beale had the seventh highest percentage of the nine sales employees who were assessed. (Doc. # 43-3 at 2-4). Beale did not request an accommodation for the 10-Point Certification Assessment or the Story Board Presentation, nor did he advise Clearwater that his performance on the assessments was related to his dyslexia. (Doc. # 40 at ¶¶ 19; Doc. # 55 at ¶¶ 19, 21).

On August 9, 2019, Clearwater conducted a separate assessment: the PREVUE assessment. (Doc. # 42-1 at ¶ 10). Rather than assessing an employee's job performance or knowledge of position-related subject matter, Clearwater used the PREVUE assessment to evaluate sales employees' personalities, interests, and motivations. (Id. at ¶ 11). The assessment results were to be used as a baseline for future hiring decisions, as well assist managers with better understanding how to oversee their employees based on their personality types. (Id.; Axum Dep. Doc. # 49-1 at 26:5-13). While the PREVUE assessment consisted of timed and untimed sections, completion time did not factor into an employee's results. (Axum Dep. Doc. # 49-1 at 26:19-21). Beale in turn

7

was never told that the PREVUE assessment related to his job performance. (Doc. # 44-1 at 165:8-11). After completing the PREVUE assessment on August 12, 2019, Beale sent Mr. Pruyn an email stating, "I finished the Prevue Assessment this morning. Some parts I was slower at because of my dyslexia. Does the assessment account for instances like this?" (Doc. # 43-4 at 2). Beale did not receive a response to his inquiry. (Doc. # 54 at ¶ 16).

In late Summer 2019, Clearwater began a new performance review process titled the "Quarterly Business Review" ("QBR"). (Doc. # 41-1 at ¶ 21). The QBR consisted of having sales employees and their supervisors each performing a subjective assessment of the employees' performance and was followed by an individual meeting between the employee and their supervisor to discuss their results. (Id.). Each then numerically assessed the employees' performance between one and four in several categories, such as "time management skills, written communication skills, pipeline development, and consistent application of Clearwater's sales process." (Id. at ¶ 23; Doc. # 46-1 at 68-69). On the QBR, Beale assessed his own performance at 3.4; Mr. Pruyn rated Beale at 2.4 and indicated that his performance needed improvement. (Doc. # 46-1 at 68-69). Mr. Pruyn met with Beale on August 13, 2019

to discuss his QBR results. (Id. at ¶ 21). Following the QBR, Beale did not inform Mr. Pruyn or anyone form Clearwater that his dyslexia had prevented him from achieving his sales or performance goals or would do so going forward. (Doc. # 40 at ¶ 32; Doc. # 55 at ¶ 32).

On August 29, 2019 — following the 10-Point Certification Assessment, the Industry Story Board Presentation, and the QBR assessments — Clearwater terminated both Beale and another other Senior Sales Director, Sheila Petaccio,[2] for their continued performance deficiencies. (Doc. # 42-1 at ¶ 16).

Beale initiated this action against Clearwater on September 18, 2020, asserting claims for disability discrimination under the Americans with Disabilities Act (ADA) and Florida Civil Rights Act (FCRA) (Counts I and III), and for failure to accommodate under the ADA and FCRA (Counts II and IV). (Doc. # 1). Now, after discovery has closed, Clearwater seeks entry of summary judgment in its favor. (Doc. # 40). The Motion is fully briefed (Doc. ## 55, 58), and ripe for review.

---

[2] Where Beale earned the seventh highest percentage on the Story Board Presentation (seventy-two percent), Ms. Petaccio earned the eighth (sixty-eight percent). (Doc. # 43-3 at 2-4).

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

10

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

### A. **Disability Discrimination Claims**

In Counts I and III, Beale asserts claims for disability discrimination under the ADA and FCRA. (Doc. # 1 at 3, 5).

11

"The burden-shifting analysis of Title VII employment discrimination claims" — as established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) — "is applicable to ADA claims." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000). To succeed on a disability discrimination claim, a plaintiff must show as part of his prima facie case that: "(1) he is disabled; (2) he was a qualified individual at the relevant time . . . ; and (3) he was discriminated against [] because of his disability." Scott v. Shoe Show, Inc., 38 F. Supp. 3d 1343, 1359 (N.D. Ga. 2014) (citation omitted); D'Onofrio v. Costco Wholesale Corp., 964 F.3d 1014, 1021 (11th Cir. 2020) ("Given the parallel structure of the statutes, this Court analyzes state-law disability discrimination claims under the FCRA using the same framework as it does for claims made under the federal [ADA].").

"If the employee is able to establish his *prima facie* case, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason" for the adverse action. Alvarez v. Sch. Bd. of Broward Cnty., 208 F. Supp. 3d 1281, 1285 (S.D. Fla. 2016). At that point, the burden shifts back to the plaintiff on the issue of pretext.

Here, the Court will assume — without deciding — that Beale has established a prima facie case of disability

discrimination. And, for its part, Clearwater has provided legitimate, non-discriminatory reasons for terminating Beale: Beale's consistent failure to meet his established sales quota with Clearwater and his failure to develop and maintain his sales pipeline. (Doc. # 40 at 20). These justifications are supported by Beale's results on the host of performance assessments conducted by Clearwater.

Thus, the burden shifts back to Beale to establish a genuine issue of material fact as to pretext. This he cannot do. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" Id. (quoting Chapman v.

13

AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, to show pretext, an employee must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004)). The Court cannot second guess the defendant's business judgment or inquire as to whether its decision was "prudent or fair." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 2003).

Beale's argument for pretext relies on temporal proximity and his disagreement with Clearwater's holding him to sales quotas when he had not been transferred the high-volume accounts. This argument ignores that Senior Sales Directors were expected to draw in new sales and accounts to meet their sales quotas, rather than rely on existing accounts. (Doc. # 43-1 at 2; Doc. # 46-1 at 6-10). Beale cannot survive summary judgment simply by quibbling with whether his performance was poor enough to merit termination or by relying on his own speculation as to the true cause of his termination. See Chapman, 229 F.3d at 1030 (explaining that a plaintiff cannot show pretext "simply by quarreling

with the wisdom of" the employer's proffered non-discriminatory reason); Aldabblan v. Festive Pizza, Ltd., 380 F. Supp. 2d 1345, 1353 (S.D. Fla. 2005) ("Plaintiff's mere belief, speculation, or conclusory allegations that Defendant discriminated against [her], therefore, are insufficient to withstand summary judgment.").

Nor could the Court find the temporal proximity — 17 days — between Beale's August 12 email and his termination sufficient to create a genuine issue of material fact regarding pretext. Close temporal proximity is, standing alone, generally insufficient to establish pretext. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) ("The close temporal proximity between Hurlbert's request for leave and his termination — no more than two weeks, under the broadest reading of the facts — is evidence of pretext, though probably insufficient to establish pretext by itself."); see also Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1328 (11th Cir. 2020) (explaining that temporal proximity of less than two months was insufficient by itself to establish pretext). The relevant question is whether Beale has presented other evidence supporting his claim that Clearwater's stated reason for

terminating his was pretextual. Daugherty v. Mikart, Inc., 205 F. App'x 826, 828 (11th Cir. 2006).

In short, the temporal proximity between Beale's August 12 email and his termination is not sufficient, standing alone, to establish pretext on his discrimination claim. See Weiher v. Lincare Procurement, Inc., No. 8:20-cv-2569-VMC-AEP, 2021 WL 4991528, at *10 (M.D. Fla. Oct. 27, 2021) (granting summary judgment for employer that terminated an employee nearly forty days after providing an accommodation due to the employee's extensive performance deficiencies that pre-dated her accommodation request).

It is insufficient because Beale has not rebutted Clearwater's reasons head on – he has not shown that Clearwater's proffered reasons for his termination were false or that the true reasons were discriminatory, and he has not demonstrated such "weaknesses, implausibilities, incoherencies, or contradictions in [Clearwater's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." See McCann, 526 F.3d at 1375; Pitts v. Hous. Auth. for City of Huntsville, 262 F. App'x 953, 956 (11th Cir. 2008) (upholding summary judgment for employer where "none of the various reasons identified by Pitts as establishing pretext dispute, 'head

on,' the [defendant's] reason for terminating him"); <u>Crawford</u> <u>v. City of Fairburn, Ga.</u>, 482 F.3d 1305, 1309 (11th Cir. 2007) ("[Plaintiff] erroneously argues that evidence of a discriminatory animus allows [her] to establish pretext without rebutting each of the proffered reasons of the employer.").

Here, it is undisputed that Beale did not meet his sales quotas for two full quarters in a row, and that he failed to develop and maintain his sales pipeline. While Beale insists he could not meet those quotas because of Clearwater's failure to completely transfer the high-volume accounts to him, this argument does not rebut that he failed to meet the objective performance criteria set by Clearwater. Nor does it rebut that Beale was in fact expected to bring in new accounts to satisfy his sales quota rather than rely on the existing accounts. Further, Beale's temporal argument is unpersuasive as Clearwater terminated another Senior Sales Director the same day for the same objective performance concerns.

The Motion is granted as to these claims.

**B. <u>Failure to Accommodate Claims</u>**

In Counts II and IV, Beale asserts claims for failure to accommodate under the ADA and the FCRA. (Doc. # 1 at 4-5).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability — unless doing so would impose undue hardship on the employer." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000)). A qualified employee with a disability has the burden of establishing that reasonable and feasible accommodations were available that would allow the employee to perform the essential functions of the job. Waddell Valley Forge Dental Assoc., Inc., 276 F.3d 1275, 1280 (11th Cir. 2001). Once the employee makes this showing, the burden then shifts to the employer to present evidence of their inability to accommodate, either due to the unreasonableness of the request, or the undue hardship the accommodation would place on the employer. Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998).

Still, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999). "Where the employee fails to identify a reasonable accommodation, the employer has no affirmative duty to engage in an 'interactive process'

18

or to show undue hardship." Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015). Additionally, an "employer is not required to accommodate an employee in any manner in which that employee desires." Terrell, 132 F.3d at 626 (citation omitted). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." Lucas, 257 F.3d at 1255-56.

Here, Clearwater argues that Beale never requested a reasonable accommodation. The Court agrees. The two actions identified by Beale — the August 12 email and his inclusion of "Dyslexia Awareness" in his signature block in certain emails — do not qualify as requests for accommodation. First, the inclusion of "Dyslexia Awareness" in his signature block is not a specific request for any accommodation. This language does not state that Beale has dyslexia, nor does it specify how Beale would like Clearwater and its employees to alter his work duties or their behavior towards him. While Beale asserts that Clearwater later verbally requested that he remove this phrase from his signature block, the phrase "Dyslexia Awareness" does not communicate a concrete need for an accommodation or provide any guidance as to the form of the accommodation Beale would be seeking.

As for the August 12 email (Doc. # 43-4 at 2), that email did not request a specific accommodation either. While Beale was concerned with how his speed in performing the PREVUE assignment might affect the results, he did not actually identify an accommodation he would like for this assignment. Nor could he have requested one, as he had already submitted his assessment by the time he sent the email to Mr. Pruyn. Even if the August 12 email could be construed as a request for an accommodation, it is undisputed that the PREVUE assessment had no bearing on or relation to Beale's actual job performance. (Axum Dep. Doc. # 49-1 at 26:19-21; Doc. # 44-1 at 165:8-11). Ms. Axum confirmed that the PREVUE assessment's purpose was, instead, to aide with future hiring decisions and managerial staff's ability to connect with their employees. (Doc. # 42-1 at ¶ 10; Axum Dep. Doc. # 49-1 at 26:5-13). The Court is unpersuaded that a request for the un-graded PREVUE assessment to take Beale's dyslexia into consideration would create a triable issue precluding summary judgment.

In short, no reasonable jury could conclude that Clearwater failed to accommodate Beale because no request for accommodation was made. Summary judgment is granted as to the failure to accommodate claims.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Clearwater Compliance LLC's Motion for Summary Judgment (Doc. # 40) is **GRANTED.** The Clerk is directed to enter judgment in favor of Clearwater Compliance LLC and against Plaintiff Charles Beale on all counts of the complaint. Thereafter, the Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 17th day of December, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE